```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/21/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGEL VALVERDE,

                       Plaintiff,

             -against-

J.D. FOLKS, Correction Officer, et al.,

                       Defendants.

1:19-cv-08080-MKV

OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

       Incarcerated Plaintiff Angel Valverde, brings this action against Defendants Correction Officer ("CO") Jaquan Folks, CO Tyrone Cunningham, CO Lawton Brown, Sergeant ("Sgt") Julio Gonzalez, Lieutenant ("Lt") Alfonso Orrico, Commissioner's Hearing Officer ("CHO") Robert Mayes, and Nurse Gina Frangella (collectively, "Defendants"), alleging various constitutional violations stemming from two use of force incidents that occurred while Plaintiff was detained at Sing Sing Correctional Facility ("Sing Sing"). (Third Amended Complaint ("TAC") [ECF No. 70]).

       Defendants have moved for summary judgment. [ECF No. 121]. Prior to this motion, Defendants filed a Local Civil Rule 56.1 Statement with their pre-motion letter in anticipation of filing this Motion for Summary Judgment. [ECF No. 114]. Plaintiff filed a Local Civil Rule 56.1 Counter-Statement with his opposition to the Defendant's pre-motion letter. (Pl. 56.1 [ECF No. 116-1]). In support of their motion, Defendants filed a memorandum of law (Def. Br. [ECF No. 121-2]), a Local Civil Rule 56.1 Statement and Counterstatement (Def. 56.1 [ECF No. 121-1]), the Declaration of Melissa M. Pickett, the Inmate Grievance Program Supervisor for the New York State Department of Corrections and Community Supervision ("DOCCS"), with several exhibits, (Pickett Decl. [ECF No. 121-3]), the Declaration of Rachael Sequin, the

Assistant Director of the Inmate Grievance Program at DOCCS, with several exhibits, (Sequin Decl. [ECF No. 121-5]), the Declaration of Robert Mayes, a CHO at DOCCS, with several exhibits, (Mayes Decl. [ECF No. 121-7]), the Transcript of the December 28, 2020 Deposition of Plaintiff Angel Valverde (Valverde Tr. [ECF No. 121-9]), the Transcript of the February 19, 2021 Deposition of Defendant Lt Alfonso Orrico (Orrico Tr. [ECF No. 121-10]), and the Transcript of the January 11, 2021 Deposition of Defendant Gina Frangella (Frangella Tr. [ECF No. 121-11]).  In opposition to Defendants' motion, Plaintiff filed a memorandum of law (Pl. Opp'n. [ECF No. 124]), and several exhibits, including the Affidavit of Angel Valverde, (Valverde Aff. [ECF No. 124-9]), and the Affidavit of Geraldo Mena, an inmate at Sing Sing, (Mena Aff. [ECF No. 124-12]).  Defendants filed a Reply.  (Def. Reply [ECF No. 125]).

For the following reasons, Defendants' Motion for Summary Judgment is granted.

## BACKGROUND

I. **Factual Background**

   A. **The Use Of Force Incidents**

   1. **Initial Use Of Force**

On August 29, 2018, Plaintiff was in custody at Sing Sing.  (Def. Br. 2; Pl. Opp'n 1).  At about 8:30 p.m. on that day, Plaintiff was involved in a use of force incident with CO Algarin, a non-party, and CO Folks.  (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30).  The parties dispute what precipitated, and the details regarding, this use of force incident.

Defendants contend that Plaintiff left his cell and refused the orders of CO Algarin to return to his cell.  (Def. 56.1 ¶ 30).  Plaintiff then attacked CO Algarin, who defended himself.  (Def. 56.1 ¶ 30).  Defendants allege that, during this struggle, another inmate, Geraldo Mena, reached through the bars on his own cell and grabbed and stabbed CO Algarin.  (Def. 56.1 ¶ 30).  During the struggle, CO Folks responded to the scene and ordered Plaintiff to stop assaulting CO

Algarin. (Def. 56.1 ¶ 30). After Plaintiff failed to comply with his orders, CO Folks tackled and restrained Plaintiff. (Def. 56.1 ¶ 30).

Plaintiff contends that he had left his cell after his door was opened to see why his cell had been opened. (Valverde Tr. 63:5–10, 62:11–14). He contends that CO Algarin confronted Plaintiff outside his cell about grievances Plaintiff had filed against other COs. (Valverde Tr. 63:15-17; Mena Aff. ¶ 3). CO Algarin then assaulted Plaintiff and they both fell on the ground. (Valverde Tr. 64:4–9; Mena Aff. ¶ 4). CO Folks arrived and began to beat Plaintiff with a baton while CO Algarin continued to punch Plaintiff in the back. (Valverde Tr. 65:4–5, 9–11, 66:18–24; Mena Aff. ¶ 5). CO Folks struck Plaintiff in the back three or four times, returned Plaintiff to his cell, and locked the cell door. (Valverde Tr. 67:3–4, 68:5–6, 11–12; Mena Aff. ¶ 8).

### 2. The Medical Clinic Incident

It is uncontested that after this first use of force incident, Plaintiff was escorted to the medical clinic, where he was placed in a "keeplock bullpen." (Def. 56.1 ¶ 30; Valverde Tr. 72:12–19). The parties dispute what happened after Plaintiff was placed in the bullpen.

Defendants contend that, upon arriving at the medical clinic, CO Algarin informed Lt Orrico that Plaintiff and an unidentified inmate had assaulted him. (Def. 56.1 ¶ 17). Lt Orrico left the medical clinic to retrieve inmate cards, which contained photos of the inmates. (Def. 56.1 ¶ 18). Upon Lt Orrico's return, CO Algarin identified Mr. Mena as the other assailant and Lt Orrico ordered that Mr. Mena be escorted to the medical clinic for assessment. (Def. 56.1 ¶ 20). Lt Orrico then left the medical clinic to assist in other parts of the facility. (Def. 56.1 ¶ 21).

Defendants state that at the same time, Plaintiff was taken to an emergency room where he was seen by Nurse Frangella. (Def. 56.1 ¶ 27). After the initial examination, Nurse Frangella left the emergency room and closed the curtain to the room behind her. (Def. 56.1 ¶ 28).

3

Defendants contend that CO Cunningham removed Plaintiff's restraints, at which point Plaintiff reached for his groin area and threatened to cut the officers. (Def. 56.1 ¶ 32). CO Cunningham, fearing that Plaintiff was reaching for a weapon, grabbed Plaintiff and brought him to the ground. (Def. 56.1 ¶ 32). He struggled with Plaintiff until Plaintiff again was placed in restraints. (Def. 56.1 ¶ 32). Nurse Frangella then returned and treated Plaintiff. (Def. 56.1 ¶ 29).

Plaintiff contends that after he was placed in the bullpen, Lt Orrico smacked the window of the bullpen and angrily told Plaintiff that he was "going to learn today." (Valverde Tr. 78:22–23, 79:1–3; Valverde Aff. ¶ 20). Within a couple of minutes, several officers arrived at the hospital, and a female officer warned Plaintiff "you know what's coming." (Valverde Aff. ¶¶ 21–22). Plaintiff was escorted from the bullpen to the examination room. (Valverde Aff. ¶ 24; Mena Aff. ¶ 18). At that time, Lt Orrico and CO Folks were standing in the doorway of the room next to the examination room. (Valverde Aff. ¶ 24; Mena Aff. ¶ 18).

Plaintiff claims that he was told to sit down in a chair while Nurse Frangella examined him. (Valverde Tr. 83:4–7). At this point, several officers entered the examination room and Nurse Frangella left. (Valverde Tr. 83:9–10; Mena Aff. ¶ 20). Before exiting the room, Nurse Frangella pulled a curtain divider to cover the door window. (Valverde Tr. 83:9–12). It is at this point that Plaintiff contends he was assaulted by the officers, including by CO Brown and CO Cunningham. (Valverde Tr. 83:5–8, 84:11–12, 14–17, 18–20, 86:24–25, 87:2–3; Mena ¶ 22). After the assault, Plaintiff was escorted by CO Brown from the examination room to the bullpen. (Valverde Aff. ¶ 25; Valverde Tr. 145:6–8; Mena Aff. ¶ 24–25). As he was exiting the examination room, Plaintiff saw CO Folks and Lt Orrico standing in the doorway of the room next to the examination room. (Valverde Aff. ¶ 25; Mena Aff. ¶ 24–25).

Plaintiff was later escorted back to the examination room and Nurse Frangella returned to examine him. (Valverde Tr. 89:21). When she returned, she saw Lt Orrico standing outside the room. (Frangello Tr. 21:20–22:12).

**B. December 11, 2018 Disciplinary Hearing**

On August 31, 2018, CO Richardson, a non-party, delivered to Plaintiff two Tier III Inmate Misbehavior Reports ("tickets"), one for each of the two use of force incidents involving Plaintiff on August 29, 2018. (Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40). The first ticket was issued by CO Folks and accused Plaintiff of refusing direct orders and assaulting a staff member. (Def. 56.1 ¶¶ 30–31; Pl. 56.1 ¶¶ 30–31). That ticket charged Plaintiff with the following rules violations: (1) Rule 100.11 – assault on staff; (2) Rule 102.10 – threats; (3) Rule 104.11 – violent conduct; (4) Rule 104.13 – creating a disturbance; and (5) Rule 106.10 – refusing a direct order. (Def. 56.1 ¶¶ 30–31; Pl. 56.1 ¶¶ 30–31). The second ticket was issued by CO Cunningham and accused Plaintiff of threatening and assaulting staff members. (Def. 56.1 ¶¶ 32–33; Pl. 56.1 ¶¶ 32–33). The second ticket charged Plaintiff with the following rules violations: (1) Rule 100.11 – assault on staff; (2) Rule 102.10 – threats; (3) Rule 104.11 – violent conduct; (4) Rule 104.13 – creating a disturbance; and (5) Rule 106.10 – refusing a direct order. (Def. 56.1 ¶¶ 32–33; Pl. 56.1 ¶¶ 32–33).

CHO Mayes was assigned to conduct the Tier III Hearing for both tickets. (Def. 56.1 ¶ 34; Pl. 56.1 ¶ 34). The disciplinary hearing took place at Downstate Correctional Facility ("Downstate") over several months to accommodate the availability of witnesses and obtain documentation. (Def. 56.1 ¶¶ 35–36; Pl. 56.1 ¶¶ 35–36). Plaintiff was provided with the assistance of Hearing Assistant Cicala. (Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43). During the hearing, CHO Mayes granted Plaintiff's request that seven inmates be called to testify, (Def. 56.1 ¶¶ 45, 63; Pl. 56.1 ¶¶ 45, 63), although Plaintiff later withdrew his request for one of the inmates to testify,

(Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51), and another inmate refused to testify (Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77). CHO Mayes also granted Plaintiff's requests to call seventeen staff members to testify at his hearing. (Def. 56.1 ¶¶ 52–57, 65–69, 73–74; Pl. 56.1 ¶¶ 52–57, 65–69, 73–74). CHO Mayes denied Plaintiff's request to call two staff members who were not present for either incident and did not have relevant information. (Def. 56.1 ¶¶ 71–72; Pl. 56.1 ¶¶ 71–72).

CHO Mayes denied Plaintiff's request to recall two inmates, Mr. Mena and Edgar Mills. (Def. 56.1 ¶¶ 80–81; Pl. 56.1 ¶¶ 80–81). Defendants assert that their testimony was not relevant because the requested testimony was for those inmates to read the tickets they received for their involvement in the August 29, 2018 incidents, (Def. 56.1 ¶¶ 80–81), though Plaintiff contends that the information in those tickets was relevant, (Pl. 56.1 ¶¶ 80–81). CHO Mayes denied Plaintiff's request for video footage of the medical clinic as not relevant or material to the issues present at the hearing because the footage requested was for a timeframe after the incidents occurred, (Def. 56.1 ¶ 93), although Plaintiff contests the basis for that denial, (Pl. 56.1 ¶ 93).

At the conclusion of the hearing, CHO Mayes found Plaintiff guilty of two of the ten charges against him, specifically Rule 104.11 – violent conduct and Rule 106.10 – refusing direct order, as described in the August 29, 2018 Misbehavior Report authored by CO Folks. (Mayes Decl. Ex. C 4–5). Plaintiff was provided with the written disposition, which summarized the evidence on which CHO Mayes relied. (Def. 56.1 ¶ 102; Pl. 56.1 ¶ 102).

In his decision, CHO Mayes relied on the ticket issued by CO Folks, the testimony of the witnesses, Plaintiff's testimony, photographs, and a redacted copy of the preliminary Unusual Incident Report Packet. (Mayes Decl. Ex. C 7–12). He concluded that there was substantial evidence to support the two charges against Plaintiff. (Mayes Decl. ¶46; Mayes Decl. Ex. C 7–12). CHO Mayes sentenced Plaintiff to one hundred and eighty days of confinement in the

Special Housing Unit and one hundred eighty days of loss of package, commissary, and phone privileges. (Mayes Decl. ¶45; Mayes Decl. Ex. C 5).

### C. Inmate Grievance Process

On November 7, 2018, Plaintiff submitted a grievance to the Inmate Grievance Resolution Committee ("IGRC"), alleging that CO Folks, CO Cunningham, CO Brown, Sgt Gonzalez, and Lt Orrico were involved in excessive force incidents with Plaintiff on August 29, 2018. (Picket Decl. ¶ 9, Ex. B (Plaintiff's November 7, 2018 Grievance)). The grievance also alleged that Lt Orrico and Nurse Frangella failed to intervene in the alleged excessive force incidents and that Nurse Frangella attempted to cover up said incidents. (Picket Decl. ¶ 9, Ex. B (Plaintiff's November 7, 2018 Grievance)). Following a facility investigation, the Superintendent issued a decision denying the grievance. (Picket Decl. ¶ 11, Ex. C (Superintendent's denial)). This decision was mailed to the Plaintiff at his then current facility, Fishkill Correctional Facility, on January 8, 2018. (Picket Decl. ¶ 11, Ex. C (Superintendent's denial)). Upon denial of the grievance, Plaintiff was advised that he could appeal the decision to the Central Office Review Committee ("CORC") by completing the appeals form attached to the decision and returning it to Downstate. (Picket Decl. ¶ 11, Ex. C (Superintendent's denial)).

Plaintiff contends that he submitted his appeal to the CORC on January 11, 2019. (Valverde Aff. ¶ 4, Ex. 2 (Appeal Statement)). However, there is no record of this appeal having been filed. ((Picket Decl. ¶ 12; Sequin Decl. ¶¶ 12–14, Ex. B). Plaintiff claims that there is no record of the appeal because prison officials interfered with his outgoing mail. On January 17, 2019, Plaintiff submitted a grievance to complain that he was not getting responses to his grievances. (Valverde Aff. ¶ 5, Ex. 3). On January 20, 2019, Plaintiff wrote Superintendent Leroy Fields to complain about the missing outgoing mail. (Valverde Aff. ¶ 6, Ex. 4). On January 25, 2019, Plaintiff wrote to Governor Andrew M. Cuomo requesting assistance.

(Valverde Aff. ¶ 7, Ex. 5). On February 7, 2019, Plaintiff received a letter from Jeff McKoy, Deputy Commissioner for Program Services regarding the problems with his mail. (Valverde Aff. ¶ 9, Ex. 7). In that letter, Mr. McKoy advised that he had investigated the matter and found no evidence of staff misconduct and that all mail was being processed appropriately. (Valverde Aff. ¶ 9, Ex. 7). Plaintiff had previously complained about issues with his mail. (Valverde Aff. ¶¶ 10–19, Ex. 8–16).

## II. Procedural History

On August 29, 2019, Plaintiff commenced this action with the filing of his initial Complaint. (Compl. [ECF No. 2]). He was later given leave to amend his complaint three times. In his Third Amended Complaint (the operative pleading), Plaintiff alleges (1) a section 1983 claim under the Eighth Amendment for excessive force against all Defendant Officers, (TAC ¶¶ 87–92); (2) a section 1983 claim under the Eighth Amendment for deliberate indifference against Defendant Michael Capra, the superintendent of Sing Sing; (3) a section 1983 claim under the Eighth Amendment for procedural due process violations against CHO Mayes and Defendant Robert Morton, the superintendent of Downstate, (TAC ¶¶ 100–104); and (4) a section 1983 claim for a failure to intervene against CO Folks, CO Cunningham, CO Brown, Sgt Gonzales, Nurse Frangella, Lt Orrico, and Mr. Capra, (TAC ¶¶ 105–110). On September 30, 2020, this Court granted the motion of Mr. Morton and Mr. Capra to dismiss Plaintiff's TAC with respect to the claims made against them. *See Valverde v. Folks*, No. 1:19-CV-08080-MKV, 2020 WL 5849515 (S.D.N.Y. Sept. 30, 2020). The remaining Defendants now move for summary judgment on the remaining claims. [ECF No. 121].

## LEGAL STANDARD

A party is entitled to summary judgment when there is no "genuine dispute as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law.

Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the motion for summary judgment is properly made, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

At all times, the ultimate burden remains on the party that has the burden of proof under the law. The Court must view the record "in the light most favorable to the opposing party," *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted), and must "resolve all ambiguities and draw all reasonable inferences against the movant," *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013) (citation omitted).

However, a party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." M*atsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *UMB Bank, N.A. v. Bluestone Coke, LLC*, No. 20-CV-2043 (LJL), 2020 WL 6712307, at *3 (S.D.N.Y. Nov. 16, 2020) (quoting *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006)).

# DISCUSSION

## I. Plaintiff Failed To Exhaust Administrative Remedies

Defendants first argue that summary judgment should be granted with respect to all Defendants on the grounds that Plaintiff failed to properly exhaust his administrative remedies prior to filing this action. (Def. Br. 8–13). Under the Prisoner Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA "requires proper exhaustion, which 'means using all steps that the [prison grievance system] holds out, and doing so properly.'" *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (internal citations omitted). "Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* (citation omitted).

The PLRA contains one textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement depends on the "'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). In *Ross*, the Supreme Court delineated "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. The Supreme Court explained that an administrative remedy is unavailable when: (1) "it operates as a simple dead end—with officers unable or

10

consistently unwilling to provide any relief to aggrieved inmates"; (2) "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44. The Second Circuit recently noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but declined to opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use. *Williams*, 829 F.3d at 123 n.2.

At the relevant time, Downstate maintained an inmate grievance procedure pursuant to DOCCS Directive 4040. (Pickett Decl. ¶ 3). That procedure required inmates to follow a three-step process. Inmates first file a grievance with the facility IGRC within 21 days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5 (a)–(b). Once the IGRC renders a decision on the grievance, the inmate could appeal that decision by filing an appeal with the facility Superintendent. 7 N.Y.C.R.R. § 701.5(c). After the facility Superintendent renders a decision on the grievance appeal, the inmate may appeal the Superintendent's decision to the DOCCS' CORC. 7 N.Y.C.R.R. § 701.5(d). Claims of harassment by staff are addressed by an expedited process, which essentially skips the step of review by the IGRC. *See* 7 N.Y.C.R.R. § 701.8. Claims of excessive force, failure to intervene, and cover-ups may be grieved through this process. (Pickett Decl. ¶ 8).

It is undisputed that Plaintiff filed a grievance for the excessive force incidents that allegedly took place on August 29, 2018. (Pickett Decl., ¶ 9, Ex. C; Pl. Opp'n 11). Plaintiff's grievance was denied and he was advised that if he wished to appeal the decision to CORC, he had to sign the appeal statement and return it to the Inmate Grievance Clerk within seven days of receipt. (Pickett Decl., ¶ 11, Ex. C; Pl. Opp'n 11). There is no record of Plaintiff filing any

notice of appeal with the Inmate Grievance Clerk at Downstate, (Pickett Decl., ¶ 12), nor is there any record of Plaintiff filing an appeal with CORC, (Seguin Decl., ¶¶ 12–14).

Plaintiff first argues that he did in fact file his appeal with CORC. (Pl. Opp'n 14). He contends that it was never filed because prison administrative officials thwarted Plaintiff's appeal by interfering with his mail. (Pl. Opp'n 12–15). Plaintiff also asserts that regardless of his failed attempt to file his appeal, the grievance program at Downstate is so opaque that it is incapable of use. (Pl. Opp'n 15–16).

### A. Plaintiff Improperly Filed His Appeal

As a preliminary matter, the undisputed record makes clear that Plaintiff did not properly comply with Downstate's prison grievance procedural rules. Plaintiff attests that he mailed his appeal statement directly to CORC. (Valverde Aff. ¶ 4; Pl. Opp'n 11). However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk. 7 N.Y.C.R.R. §§ 701.5(d)(1), 701.6(h)(2). In fact, the appeal form Plaintiff claims to have submitted states that the appeal needs to be submitted to the facility grievance clerk, not directly to CORC. (Valverde Aff. Ex. 2). The PLRA requires "compliance with [the prison grievance system's] . . . procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Williams*, 829 F.3d at 122 (citation omitted). Plaintiff's failure to properly comply with the procedural rules to appeal his grievance bars his claim here.

### B. Plaintiff's Assertion That Prison Officials Thwarted His Appeal Is Speculative

Putting aside that the likely explanation for why Plaintiff's appeal was never filed with CORC was that, as discussed above, he improperly filed it, Plaintiff's claim that Defendants interfered with his mail is wholly speculative. In support of his assertion that Defendants

12

interfered with his mail, Plaintiff submits only his own sworn affidavit. (Valverde Aff. ¶ 2). None of Plaintiff's "evidence" even suggests that he had any personal knowledge of any mail tampering. Plaintiff also now contends that he filed several correspondences and a grievance regarding mail tampering, (Valverde Aff. ¶ 5–7, Exs. 3–5), but, again, none of his assertions even purport to be based on any personal knowledge of any such tampering or interference with his mail. Conversely, Plaintiff's own evidence includes a letter from Jeff McKoy, Deputy Commissioner for Program Services, in which Mr. McKoy attested to have investigated the matter and found no evidence of staff misconduct and that all mail was being processed appropriately. (Valverde Aff. ¶ 9, Ex. 7). As such, Plaintiff's claim that prison officials tampered with his mail and impeded his ability to appeal his grievance is pure conjecture that does not preclude the Court from granting Defendants judgment as a matter of law. *See Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." (citation omitted)).

      **C. The Administrative Scheme Is Not Opaque**

Plaintiff also asserts that the grievance program is so opaque that it is incapable of use. (Pl. Opp'n 15–16). He cites to NYCRR § 701.5(3)(i), which states that "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP Supervisor in writing to confirm that the appeal was filed and transmitted." He points out that under NYCRR § 701.6 (g)(1)(b), "[a]n exception to the time limit [to file an appeal] may not be granted more than 45 days after the date of the decision unless the late appeal asserts a failure to implement the decision." Plaintiff asserts that under this scheme, there is no procedure for an inmate to remedy a deficiently filed appeal because by the

time they learn the appeal was deficiently filed, it will be too late to file the appeal.  (Pl. Opp'n 15).

However, to establish that a grievance program is so opaque that it is incapable of use, the program must be more than merely ambiguous, it must be "so confusing that . . . no reasonable prisoner can use them."  *Ross*, 578 U.S. at 644 (citation and internal quotation marks omitted).  The DOCCS rules clearly provide that if a grievant does not receive confirmation of CORC's receipt of an appeal within 45 days of its submission, he should correspond with the grievance supervisor asking for that confirmation.  NYCRR § 701.5(3)(i).  Plaintiff's contention that NYCRR § 701.5(3)(i) appears to conflict with NYCRR § 701.6 (g)(1)(b) is without merit because the 45-day limit for filing grievances and appeals is only a restriction on the facility grievance supervisor, not CORC.  *See* NYCRR § 701.6 (g)(1)(b).  As such, it is possible that if Plaintiff had sought an extension to file an appeal from CORC, he could have received one.  Plaintiff never did so.

Plaintiff primarily relies on *Williams v. Correction Officer Priatno*, 829 F.3d 118 (2d Cir. 2016), in support of his argument that the grievance program here is opaque.  However, that case is inapposite.  (Pl. Opp'n 13–14).  In *Williams*, an inmate in a special housing unit (the "SHU") attempted to file a grievance for officer misconduct by giving the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU.  829 F.3d 118, 120–21.  A week later, the inmate spoke with the facility superintendent and asked why he had not received a response to his grievance, and the superintendent informed the inmate that she had no knowledge of the grievance and would have to look into it.  *Id.* at 121.  About a week after that conversation, the inmate was transferred to a new facility and never received a response to the grievance.  *Id.* Taking the inmate's allegations as true, the Second Circuit held that the "regulations simply do

14

not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* at 124. The court found that "the regulations give no guidance whatsoever to an inmate whose grievance was never filed[,] . . . do not describe a mechanism for appealing a grievance that was never filed[,] . . . [and thus,] the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 124, 126.

Here, unlike *Williams*, Plaintiff concedes that his initial grievance was processed and answered. (Pl. Opp'n 11). Moreover, Plaintiff concedes that after being transferred to a different facility, he received the Superintendent's decision denying his grievance. (Pl. Opp'n 11). Plaintiff had an avenue to appeal the denial of his grievance, however he filed the appeal form improperly and it does not appear that he made any attempt to ever ask the grievance supervisor for confirmation that his appeal was received.

\*     \*     \*

Plaintiff has failed to exhaust the administrative remedies available to him and therefore his claims here are barred under section 1997e(a) of the PLRA. As such, all Defendants are entitled to judgment as a matter of law. The Court need not separately address the merits of the claims against the individual defendants or decide whether the conflicting accounts of the Defendants and Plaintiff create a material issue of fact precluding summary judgment. Nonetheless, the Court addresses the merits of the claims against Nurse Frangella and CHO Mayes below because there can be no argument that there are genuine issues of material fact with respect to the claims made against them and that Nurse Frangella and CHO Mayes are entitled to judgment as a matter of law.

## II. The Failure To Intervene Claim Against Nurse Frangella Fails To State A Cognizable Claim

Even had Plaintiff properly exhausted the administrative remedies available to him, he still cannot state a section 1983 claim for a failure to intervene against Nurse Frangella. It has long been recognized that the duty to intervene to protect the constitutional rights of citizens from infringement by law enforcement officers applies to *law enforcement officials*, not non-police state actors. *See Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994))); *see also Rendely v. Town of Huntington*, No. 2;03-CV-03805-ENV, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (finding that defendants, who were civilian employees, "and thus not law enforcement officials, [] had no authority or duty to intervene" to prevent police officers from violating the plaintiff's constitutional rights); *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 220 (D. Conn. 2001) ("[T]here is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor . . . to intervene to prevent a police officer from conducting an unlawful search and seizure."). Nurse Frangella is a registered nurse (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26), not a "law enforcement official." She had no affirmative duty to intervene to protect Plaintiff's constitutional rights from infringement and therefore is entitled to judgment as a matter of law on Plaintiff's claims.

Plaintiff argues that "[s]imilar to the law enforcement duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence, nurses have a duty to protect their patients from foreseeable harm." (Pl. Opp'n 18). In support of his argument, Plaintiff cites to *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 249, 765

N.E.2d 844 (N.Y. 2002). In *Cabrini Medical Center*, the New York Court of Appeals was presented with the question of whether hospital nurses who were in close proximity to a patient had a "duty to protect" that patient when she was sexually assaulted by another hospital employee. *Id.* at 254. *Cabrini Medical Center* is inapposite since it involved state tort claims and did not consider federal constitutional violations. Moreover, *Cabrini Medical Center* did not address a nurse's duty to intervene to protect a plaintiff from constitutional violations perpetrated by *law enforcement*.

### III. The Procedural Due Process Claims Against CHO Mayes Fail As A Matter Of Law

CHO Mayes is also entitled to judgment as a matter of law on Plaintiff's Due Process claims, independent from Plaintiff's failure to exhaust the administrative remedies available to him. Plaintiff alleges that CHO Mayes violated his due process rights by: (1) improperly denying Plaintiff the ability to call certain witnesses and introduce video footage; (2) ignoring "factual inconsistencies in written and oral testimonies"; and (3) issuing "an insufficient written decision." (TAC ¶ 102).

The undisputed record makes clear that Plaintiff was afforded ample due process by CHO Mayes. He was granted permission to call twenty-four witnesses (seven inmates and seventeen staff) and to present documentary evidence. The hearing was conducted over several months to accommodate witnesses and Plaintiff was provided with a hearing assistant to help him.

Due process protections do not afford a prison inmate the "full panoply of rights" due to a defendant in a criminal prosecution. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). Nonetheless, an inmate is entitled to "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a

written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary action taken." *Id.* Any disciplinary action that results must be supported by at least some reliable evidence. *Id.* Analyzing whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001). The question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board. *Id.*

Although an inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence, this right must be balanced against the needs to maintain institutional safety and correctional goals. *Wolff*, 418 U.S. at 566. There is also no requirement that an inmate be allowed to present evidence that is irrelevant, *Elder v. McCarthy*, 967 F.3d 113, 124 (2d Cir. 2020), or that would unduly delay "the penological need to provide swift discipline in individual cases," *Ponte v. Real*, 471 U.S. 491, 495 (1985). Further, "any violations" of an inmate's "qualified right" to call witnesses or present documents "are reviewed for harmless error." *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009) (internal quotation marks omitted).

Here, the record is clear that Plaintiff was provided ample due process protections at his hearing. Plaintiff received advance written notice of the charges against him when CO Richardson gave him a copy of each of the two Tier III tickets on August 31, 2018. (Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40). Plaintiff was permitted to mount a defense by introducing documentary evidence and by calling numerous witnesses and posing questions to those witnesses. (Def. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77; Pl. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77). CHO Mayes issued a written statement of the evidence relied on in reaching his decision and the reason for the punishment imposed. (Mayes Decl. Ex. C 7–12).

18

Plaintiff first argues that CHO Mayes' written statement was constitutionally deficient because "only six lines describe the basis of the hearing officer's decision." (Pl. Opp'n 20). Putting aside that CHO Mayes' report is thoroughly detailed, (*see* Mayes Decl. Ex. C), Plaintiff's argument is also without any support in the law. There is no minimum page requirement for a disciplinary written decision. It need only contain "the evidence the factfinder relied on and the reasons for the disciplinary action." *Williams v. Chuttey*, 767 F. App'x 105, 109 (2d Cir. 2019).

Plaintiff contends that CHO Mayes did not rely on reliable evidence in support of his findings. (Pl. Opp'n 21). He cites to the testimony of five witnesses whose testimony controverts the findings of CHO Mayes. (Pl. Opp'n 21). However, in determining whether Plaintiff's due process rights were violated, the Court need not independently assess the credibility of witnesses or weight the evidence. "Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Gaston*, 249 F.3d at 163 (internal quotation marks omitted) (emphasis omitted). Here, CHO Mayes' findings were supported by evidence that was before him. (*See* Mayes Decl. Ex. C 7–12). This evidence included, among other things, the misbehavior report authored by CO Folks, the multiple witnesses who testified, and the documentary evidence reviewed at the disciplinary hearing. (Def. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77; Pl. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77). That Plaintiff may disagree with CHO Mayes' findings of fact does not mean that CHO Mayes violated his constitutional rights.

Plaintiff also takes issue with the fact that CHO Mayes denied Plaintiff's requests to present certain witnesses and documentary evidence during the hearing. (Pl. Opp'n 21–22). Plaintiff first complains that he was not allowed to present documentation regarding the recovery of a weapon used against CO Algarin, (Pl. Opp'n 21), and testimony of a witness whose cell was searched for that weapon (Pl. Opp'n 21–22). However, a prisoner's right to call witnesses or

present documents "can be denied on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991).  This evidence was irrelevant because Plaintiff was not found guilty of assaulting CO Algarin with a weapon.  (*See* Mayes Decl. Ex. C 14).

Plaintiff also complains that CHO Mayes denied Plaintiff's request to recall Mr. Mena as a witness to read his misbehavior report from the day of the use of force incident.  (Pl. Opp'n 21–22).  Plaintiff contends that Mr. Mena's testimony was relevant because he witnessed some of the events surrounding the use of force incident.  (Pl. Opp'n 21).  However, CHO Mayes explained that he declined to call Mr. Mena because Plaintiff merely wanted Mr. Mena to read his own misbehavior report, which CHO Mayes determined was irrelevant to Plaintiff's own conduct.  (Mayes Decl. Ex. C 105–06).  The CHO could of course also read the report for himself.  Moreover, even if this determination was in error, that error was harmless.  *See Pilgrim*, 571 F.3d at 206.  CHO Mayes' decision was supported by substantial evidence, (Def. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77; Pl. 56.1 ¶¶ 45–57, 63, 65–69, 73–74, 77), which clearly meets the "some evidence" standard, *see Sira*, 380 F.3d at 69.

## CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is GRANTED.

The Clerk of Court is respectfully requested to close docket entry 121 and to close this case.

**SO ORDERED.**

**Date:  March 21, 2022**  
**New York, NY**

_____  
**MARY KAY VYSKOCIL**  
**United States District Judge**